Good morning, and may it please the Court, my name is Celia Reumann, and I represent Denise Robertson before this Court. I'm going to try to reserve three minutes for rebuttal. All right. In this case, the district court erred in failing to dismiss or even instruct the jury on the loss of critical evidence, evidence that was destroyed, a videotape showing the area where the government alleged the crime occurred. It took inadequate corrective action after agents and government lawyers violated the witness exclusion or sequestration rule. It erred in failing to inspect documents in violation of the Jenks Rule, and it misinstructed on the requirements for conviction of embezzlement, eliminating the entrustment requirement in violation of due process. Given the time limits here, unless the Court has questions on the other issues, I'd like to focus on the destruction of evidence issue and the witness exclusion issue. As to the destruction of evidence issue, Ms. Robertson was arrested on June 26, 2014, for embezzling mail. The government alleged, among other things, that on that day, she put mail into a car that was in the parking lot of the post office where she was employed. The post office had a video recording system, a video recording that showed the parking area. That day, the day she was arrested, the case agent was advised by the union representative that there was a video recording system on the outside of the post office. He ignored that information. That video would have shown the car, the location where Ms. Robertson's car was. After her arrest, she was terminated from the post office, and she challenged that termination. The basis for the termination was the embezzlement of the mail. During July, before the videotape was destroyed, Agent Longton was again advised of the existence of the tape, her request for the tape, and the import of the tape, and again, Agent Longton ignored this information, and the videotape was subsequently destroyed. Sotomayor, are you asserting that the agent acted in bad faith? I am in this case. And the evidence of bad faith is Agent Longton's admission in this case. He testified in this case that he was aware of the tape, and he was advised that Ms. Robertson was alleging that the tape showed or that someone had planted evidence in her car. So the standard for bad faith is one in which the Court looks at whether the evidence was apparently was, whether it was, the exculpatory value of it was readily apparent. And in order to determine that, I think it's the Youngblood decision and this Court's decision in Zaragoza talked about evidence that might have exonerated the defendant. That's the standard for determining whether it is apparently exculpatory, such that if the agent is advised of it and knows of it and ignores it and it's destroyed, bad faith is established. In this case, how did the district court rule? The district court in this case ruled that there was no bad faith. And what is our test on the determination by the district court that there was no bad faith? I believe it's clearly erroneous. You have to demonstrate this was clearly erroneous. Not just erroneous, but clearly erroneous. How do you get up to that standard? Well, I think Agent Longton's admissions, in this case he testified that he was aware of the evidence and knew that Ms. Robertson was alleging that it had been planted. This case is really analogous to the Zaragoza decision by this Court. This isn't something he took and destroyed. This is something the machinery itself, apparently not to his knowledge, plays over periodically. That's correct, Your Honor. And that's the point. And if he believed that it was still going to be there, the Court could find that he didn't exercise bad faith. It's still going to be there to be taken, isn't it? I believe, based on the Zaragoza case, that that decision is clearly erroneous, because it was the same set of facts in the Zaragoza case. The border tape in that case was automatically overwritten every 30 days.  And the government didn't act on that. And it was erased in kind of the normal course of things. The same thing occurred here. In this case, Agent Longton, the case agent investigating this case, specifically was advised of the existence of the tape. And he didn't act, and it was overwritten in the ordinary course. So I think on that fact, these cases are very analogous. But I think here, the bad faith is also demonstrated because Agent Longton was aware that this was relevant to what she was alleging would be her defense. That was that someone else put the evidence there. And applying the test for determining whether something is bad faith looks to, and I think the Zaragoza case linked the exculpatory value to bad faith. So you can't have bad faith if the government doesn't know of the exculpatory value, is kind of the way the Zaragoza case talked about it. And I think that's the circumstance here. The agent did know of the exculpatory value, and he didn't act on it. But even if this Court were to find that there was no bad faith, the district court in this case still erred because it refused to give an instruction on the loss of the evidence. Roberts, can I, before you move on to that, going back to bad faith, in Zaragoza, was there testimony that the agent knew about the 30-day erasure policy? I don't know whether there was in that case. I apologize. I'm not sure if in that case the agent testified that she was aware of it or not. I think she did. Okay. And let's, I don't know for sure, but let's say that's the case. Is there testimony, similar testimony about our Agent Longton in this case? I don't think there is in this case. Do we need that? Just to follow up on Judge Wallace's question, to find that the district court was clearly erroneous in saying that there was no bad faith. Don't we have to be able to say that not only was he aware that there were cameras, not only was he aware that there was potentially exculpatory information on there, but that during the window in which he could have acted, he knew that this evidence was going to be destroyed? Isn't that the chain of inferences you need in order to find bad faith? I don't think you need all of those things to get the inference, Your Honor. And I think it's because of the standard from Youngblood that it might have exonerated the defendant. The agent was aware. And I think there was in this case, you know, some evidence that the agent did not act according to what would be standard police practices. If the agent's advised that the defendant is alleging a defense, that is that someone else, you know, committed the actual crime in this case, standard police practices would seem to include the actions of an agent who would act on that. Oh, I don't think there's much question that Agent Longton was at best, he was negligent in not seeking to obtain the tapes. But I'm just saying in terms of what we're trying to determine is whether he acted in bad faith, right? There's some deliberateness there that you kind of become aware that there's evidence that's potentially helpful to the person you're investigating and you'd rather not have that evidence surface, right? That's the kind of inference we have to draw. And so Agent Longton did eventually get around to checking on this in September. And so don't you have, didn't you have, your client have the burden to show that he knew by then that the evidence would in fact be gone? Well, I think what we have from Agent Longton is more than negligence. It's more akin to deliberate ignorance, which this Court has found to be an affirmative knowledge type action. Here the agent repeatedly is advised. There's a videotape. The videotape is there. She's asking for the videotape because it will show she didn't do it, and he didn't do anything about it. And I think that's what's happening. Repeatedly, Longton received a copy of the post office union's request. That was sometime after. How long after the event was that, that he got the event? I believe he testified it occurred on January or, excuse me, July 14th, which was within the 30-day window where the tape was still available. So do we have a specific date in the record? I believe it's July 14th. How many days after? She was arrested on June 26th, so that's 20 days. So he had 10 days still from that date to obtain it before it would have been erased. I believe that's the timeline, Your Honor. And so based upon that, you feel the district court was wrong and that he was really intentionally hiding this evidence by letting it go? I don't think he has to intentionally be hiding it. I think what the standard requires is that there's bad faith in that he's aware of it and he doesn't. Aware of it, the tape, or what the tape contains? Well, no one saw the tape, so he doesn't have to know what's on the tape. What he has to know is that there's evidence that might exonerate the defendant. And here the tape might have exonerated the defendant, and that's what she was alleging. But even in the absence of bad faith, the district court erred in refusing to give a loss of evidence instruction. Counsel, before we go there, even if we agree with you that the district court erred, why wasn't any error harmless? I don't think when it comes, and I've looked at this issue a bit. I don't think that there is a requirement where there's a destruction of evidence that it be harmless. But even if it is a harmless error standard, in this case, the government hasn't demonstrated that the evidence was harmless. The government portrays this as a caught red-handed kind of case. What the evidence actually was in this case was that the agents saw on a video, they were watching her in the post office. They saw what they thought was her putting mail into a bag that was hers. Moments later, they approach her, they seize her, they seize the bag, and there's no mail in there. So, counsel, are you saying that it struck, there is no harmless error analysis that can be engaged in if there's destruction of evidence? I, I. It's not structural error, counsel. I mean, there has to be harmless error. And I argued, I didn't argue in my brief that there was no harmless error analysis, but in looking at the Zaragoza case, it struck me that, and I watched the oral argument, that the court talked about what the remedy is when there is a destruction of evidence, and it's dismissal. Here she's appealing the failure of the district court to dismiss. And the district, I believe, even though, as I said, even if there is a harmless error standard, I don't think the government's met it here. But implicit in that case is the, the prejudice to the, to the defendant in the Zaragoza case. I mean, all throughout the discussion is the, the fact that this evidence would have been of assistance to her. Well, and I think that's part of the bad faith analysis, is how important this evidence was. And here it was the evidence of the actus reus of the crime, as the government alleged it. Well, but missing from this record is any indication of what the significant evidence on the videotape would have been. And that's the same in Zaragoza, because no one saw the videotape. Here there's a videotape that would have shown the area where the government says the crime was committed. But in Zaragoza, it would have shown definitively whether or not the individual was there or not. So what would it have shown, what would the videotape have shown in this case, that mail had been placed in her car? Is that, is that her argument? I think that what the video would have shown is whether anybody approached her car that afternoon when the government says she put mail in her car. But that's kind of speculative. In Zaragoza, there was a definitive statement that a person was or was not in the line at a particular time. But here the argument is perhaps somebody approached the car. And that's the standard is whether it might have exonerated. And here it might have exonerated. And that's what she advised the government was the import of the tape. And that's why I think in this case there's bad faith. I'd like to reserve the remainder of my time for rebuttal. All right. Thank you, counsel. Thank you. We'll hear from the government. May it please the Court. My name is Peter Kozinets. I'm from the U.S. Attorney's Office in Phoenix. There was overwhelming evidence of the defendant's guilt introduced at this trial. And the judgments and convictions should be affirmed for at least three reasons. First, the district court properly found that there was no evidence of bad faith. There was no conscious, intentional destruction of evidence to gain some sort of tactical advantage over the defense. And any apparently exculpatory value of this evidence was not apparent to Agent Longton. Okay. Let's stop there, because Agent Longton did testify, as your opponent has said, that he did become aware in the window, the 30-day window, that Ms. Robertson was claiming that the video would show that others, and in particular the government, had planted the letters in her car. So he testifies that he knew that as of July 14th. He knew also by then that there were, in fact, cameras that could show whether that allegation was true. And I guess with those two facts established by his own testimony, I'm not sure I see why this is distinguishable from Zaragoza. Okay. Well, first of all, Agent Longton did not testify that he was aware of this camera system at that time. He was aware of the union's request in this grievance proceeding. No, no, no, no. On the day that she was arrested, he's standing outside in the parking lot. First of all, it's just not credible that an agent, I assume he has at least a little bit of experience, would, when he sees people pointing up on the wall to a camera in a parking lot that he knows is a crime scene, you're just not going to persuade me that he somehow remained ignorant until September that there was even a camera there. I just think that's absurd. So he's standing out there while people are discussing the fact that there are cameras there that have captured what happened that afternoon. I think there's testimony that someone actually pointed out to him where on the wall the thing existed. So the fact that he didn't testify that he knew neither here nor there, I think it would be clearly erroneous for the district court to say that he somehow didn't know. So, well, just take my – you're not going to persuade me on that. So just take it that – and I'm not saying that's where my colleagues are, but if you're going to get my vote, I need you to help me with this. So take it as a given that he knew that there were cameras and that on July 14th he becomes aware that she's alleging that what the cameras will show is that you all, the government, planted that evidence in her car. So on those two facts, why is this case distinguishable from Zaragoza? It's distinguishable for at least two essential reasons. First, the level of notice that Agent Longton had here isn't anything close to the level of notice that animated the decision in Zaragoza. Now, I know that Your Honor has a different view, but there were credibility issues about this at the preliminary hearing in a trial. And Agent Longton did expressly testify that he was not aware of the camera system and that it wasn't pointed out to him at the time. And maybe you'll persuade my colleagues of that, but I'm not persuaded and you're not going to persuade me that he remained ignorant of the existence of the cameras. They were pointed out to him the day she was arrested while he's standing out there in the parking lot. So help me with that. So assume that he did know and that he did become aware in the 30-day window that she at least was claiming that the cameras would show that there was exculpatory material on there. So how, again, is this case distinguishable from Zaragoza? So he testified that he wasn't aware, he didn't realize that this evidence had potentially exculpatory value. And in contrast, he says, let me, can I just read you what he said? Sure. I requested information from our labor relations specialist, Vicki Valenzuela. She told me that the union was making some assertions that we planted evidence. That's on July 14th, right? So how does he not know that she's contending that if you all would get those videos, they are going to show that it wasn't me who went out there and put those letters in there, it was you guys. He's told that on July 14th. So at this point in the investigation, maybe really the core of this issue is really how relevant is this evidence to the case? Now, the defense has argued that this would have somehow completely exonerated the defendant. But really what this relates to is only one of the seven charged mail items. As to this one item, the San Filippo test letter, the government contends that the defendant placed that letter in her car on this afternoon in question. This challenge doesn't go to the other six items. Roberts. Yes, but wait a minute. If you're going to try to say that if the video in fact had shown a government agent planting a letter in her car, that somehow you all still would have won convictions on the other counts, I just don't think that's believable. Especially given the suspicious circumstances under which the letters in her purse were later found. That just, right? We have to keep in mind also, Your Honor, that the defense affirmatively disclaimed any theory that OIG, that the government, planted evidence in the car. That's clearly on the record from the preliminary hearing. So it's not the defense's contention that the government did any of this. It's that some unidentified third person that we don't know of did this. So he doesn't know. She doesn't know who because she didn't get the tapes. Right? Her contention, at least back on July 14th, was that the tapes would show. Which takes us to the next significant reason why this case is not Zaragoza. In Zaragoza, it was abundantly clear that the tapes were tapes of this pedestrian crossing line, and they would have been able to corroborate the defendant's complete defense to the charges about how she was acting out in that line. Here, the whole subject matter of the preliminary hearing involved the potential usefulness of these tapes, among other things. And the record is clear that the tapes were, by all accounts, essentially useless. The evidence adduced at that hearing showed that this external system was installed not to monitor employees in the parking lot, but to monitor this canopy made of copper that covered the parking lot. Secondly, Michelle Trujillo, the then-manager of the Arcadia station, testified at trial that most of the time, the view from camera 5 of the parking lot was obstructed by carrier vehicles which were parked in front of the camera. That's at SCR 1736. Third, Agent Longton testified that he went back with the person who had installed the cameras and conducted an investigation and a review of how the cameras were set up. There was only one external camera that's even pointed in the direction of where the defendant's car might have been parked that day. And as to that camera, it only showed the car area at a distance and only showed certain areas. It didn't show the rear of the trunk of the car. It didn't show the passenger rear entrance to the car. And the video was of such dubious quality that it would not have enabled anybody to identify who might have accessed her car. And that is, in the opening brief of the defense, they claimed that this information is so important because it would have shown definitively and conclusively whether the defendant or someone else had placed evidence in her car. That's completely contrary to the record. And the defense never meaningfully challenged that evidence that was offered at the preliminary hearing on this point. In Zaragoza, in contrast, the government did not attempt to challenge the defense contention that the video would have been potentially useful evidence, whereas here it was amply challenged. And the district court had the benefit of reviewing all of that evidence and testimony in making his bad faith determination. Roberts. But that's what the court said, though. The court just said that I find that Agent Longton didn't act in bad faith. And that has nothing to do, has nothing to do with what the tape may or may not have shown, because he didn't know at the time he let this evidence become, be destroyed, what was going to, what it was going to show. Right? But the Court's findings weren't limited to that. At pages 254 and 255 of the excerpts of records submitted by the defense, the Court goes on to recognize that the contents of this videotape was speculative and completely unknown whether this would have shown anything that might have been of potential assistance to the defense. And so that also was a key part of the district court's finding, and that was supported by substantial evidence. There's no indication that that was a clearly erroneous conclusion based on all of the evidence adduced at the preliminary hearing. And so is that sort of a harmless error kind of rationale? Well, we can. What pages, by the way, did you say? Did you say? 254 and 255. Okay. Of your all's? No, of the defense excerpts of records, where the district court makes findings on the bad faith issue. It also, these arguments, Your Honor, also do go to harmlessness, because really for three essential reasons, this error, if any, was harmless. First of all, because this information was essentially useless, the record shows that there was no indication it would have exonerated the defendant or approved what the defense claims. That's reason number one for harmlessness. Reason number two for harmlessness is that the defense was fully able to press this issue before the jury. They were given very wide latitude to go into this, and they did. In their opening statements, they informed the jury about the existence of this evidence before it was lost. They cross-examined Agent Longton not once but twice. He got sick in the middle of trial and had to testify twice. He gave two directs and two cross-examinations on days five and ten of the trial, at which point the defense raised this issue repeatedly. The defense also examined the manager of the Arcadia Station, Michelle Trujillo, about these issues. It offered its own witnesses from the union, Lynette Liberty and Dan Versluis. It called a witness from the agency responsible for installing the cameras, John Curran, and examined him. So it repeatedly pressed these issues before the jury. That's reason number two why the error was harmless. And reason number three is, simply put, the evidence of this defendant's guilt was overwhelming. The jury was shown a 31-minute video taken by the OIG agents the afternoon before her arrest, where the video and the agents observed the defendant return not once, not twice, but three times to the collection hamper, rifle through the collection hamper and pull out letters that looked like they were greeting cards, and then take them back to her desk and put them into her personal belongings. Under the Kelly case and the other cases we cited in our brief, the crime of embezzlement was completed at that point. The jury also heard from numerous witnesses and victims about gift cards that were stolen from mail process at the Arcadia Station that were directly tied to this defendant, days and times that she worked, and the fact that her adult daughter redeemed these cards at retail establishments in other parts of the greater Phoenix  area. And were those — was the evidence related to the gift card such that you could tell that it was the very gift card that the person who sent the letter had purchased? It wasn't just like some generic Target or whatever. Not at all, because from the victims, they were able to get the gift card receipts, and then they were able to go to these retail establishments, Target and Walmart, and even pulled video and sales records that showed the defendant's adult daughter redeeming these cards. So the evidence was very clear and definitive. And this was evidence that Agent Longton developed initially in his investigation as it continued over time. With respect to the one letter that the defense is making this exoneration argument about, the letter that the government alleges was placed in the car that afternoon, the evidence is also very clear that that was — it was the defendant who was responsible for that as well. And I'll explain why. That test letter was placed by OIG agents on the defendant's collection route at about 2 o'clock the afternoon of her arrest. It was put in one of these group collection boxes where the carrier needs a key to unlock it and take out all the group mail. The testimony of trial showed that the letter was placed on her route at 2 o'clock, and then it was found the next day in a handbag in the backseat of her car. The notion that somebody else somehow got a hold of this letter, even knew the OIG had placed it in her collection route, and obtained it from the defendant and put it in her car is highly — it's fantastical. And the government's burden is to prove guilt beyond a reasonable doubt, but not beyond all conceivable doubt. So for all of these reasons, any potential error there was harmless. Does the Court have questions? I do. I want to talk to you about the Grinnell interview. That troubles me somewhat. Here the district court had a responsibility to see if this was Jenks Act material. They — there was testimony about it, and they talked about it. And at one point, where the judge is asking questions, he asks about it and he takes the prosecution's word for an issue that's in the — now, that is diametrically opposed to Johnson. And Johnson says the district court can't do that and must look at the actual statement itself. I don't know how you would get around Johnson. I mean, it's pretty clear. I can see why the law in the Ninth Circuit might be different, but it isn't. And it strikes me that unless we find some, or you can demonstrate for us, some reason why we shouldn't apply the Johnson case here, that we at least have to vacate that part of the case and send it back for the district court to take a look at that particular evidence and then remake the ruling. Your turn. Thank you, Your Honor. So the first answer is that more recent Ninth Circuit authority recognizes that the defense has to make more of a foundational showing in order to trigger in-camera review. Yeah, that might be true. But here Johnson says specifically the district judge must. And so how do you — how do we say that? How do we — So in the more recent case law, such as the Henke case from the year 2000, the Michaels case from 1986, and the Alvarez case, which the defense cites from 2004, in those cases the courts find that in-camera review isn't yet triggered until the defense makes a foundational showing. And what we have here, it's in the record at SER, our supplemental excerpts of record, pages 900 to 902, where the relevant testimony is located. Agent Longton testifies that he jotted down the phone number for this witness, Mr. Gundell, but he didn't recall making other notes. And there was no follow-up questioning to establish any foundation that he had created sort of narrative, really Jenks Act-type statements, substantially verbatim recitals of the witness's narrative, the count of events, or a statement adopted or made by the witness. There's no foundational information about that. So there's not enough to trigger in-camera review. There — Well, wait a minute. If that were true, Johnson would have been decided differently, because they did talk about what was in there. But I'm not saying Johnson was the best case or should have been the case. I'm saying it is the law that governs us. And in Johnson, you had the same situation. And they talked about it, but Johnson says you should have looked at it. Well, in Johnson — so apart from these more recent cases, I think Johnson is also distinguishable, because the notes there were arguably far more important. In that case, we were dealing with the agent's notes of his arrest and interview of the defendant himself. And that's something that's far more substantive than merely jotting down the contact information for a witness. The question was whether there was enough description by the agent of what the Grinnell would say, whether there's enough there to be jinx. And the judge decided no, there isn't. But then Johnson says you've got to look in that situation. I mean, I'm not being — trying to be critical. I'm just saying how can the government distinguish the case? Well, it's distinguishable because of the centrality. The notes in Johnson were far more important than they were here. We're dealing with the initial contact, just that first June 2nd telephone call where Agent Longton, you know, initially makes contact with this witness, gets his contact information, makes arrangements to meet with him to obtain a copy of the letter that was altered. And in our case, the government went on to disclose Agent Longton's entire narrative investigative report, which summarized his communications with Mr. Gundell. And his search warrant affidavit, of course, is part of the record, which also contains  So the more — I understand. But the real question is, in addition to information about I'm going to see at such and such a date, was there anything said about what Grunell said happened? Did he take a note on that? And that's what the other side is talking about, that that's Jenks and it should have been turned over. Then we'd have to decide whether or not that requires changing the case. But the issue itself is hard for me. Okay.  And I'm just going to end by showing that there was in the Johnson case here. And moreover, there's another case called Beauchelle, where the Ninth Circuit said that any potential error was harmless, where the defense never argued that this disclosure issue would have really made any difference in the outcome of the case. And that is exactly the situation here. There was no argument that this was critical information that would have changed the outcome. It's just notes of that initial contact. And here we have so much evidence on the Gundell letter counts, just overwhelming evidence such that any potential error involving that initial conversation was harmless. We had — Counsel, may I ask you, how extensive were the notes that we're talking about here? How extensive were they? Does the record reflect what the notes were? Were they a page, two pages, a couple of words? How extensive were they? Because in Johnson, there was a written report of an interview and the circumstances of the arrest, which is a lot more substantial than I get the idea we're talking about here. Could you help us with that in terms of how extensive the notes were? Sure. Well, just looking at the record, what we have is Agent Longton's testimony and the questions that he was asked by defense counsel. And all the testimony shows is that he noted contact information, a telephone number for the witness, made arrangements to meet with him later. Not with the making arrangements part of the notes. I'm interested in precisely what the notes were. So I think this is on page 900 of the SCR. But there's testimony where Agent Longton is asked, you know, did you make any other notes? And he says, no, not that I recall. And so your representation of the record is that the only information contained in the handwritten notes was contact information? Contact information is what he testified to at the trial. So in other words, it's not what we don't have from the trial testimony is an indication that the notes were really as substantial as the notes in the Johnson case, which dealt with an interview of the defendant and the circumstances of the defendant's arrest. Do you agree that this was Jenks Act material? No, because it didn't — there was no showing that it rose to the level of Jenks Act statements. And the case law we cited in our brief was that rough notes, jotting down of scattered information here and there doesn't rise to the level. Instead, you're really looking at sort of a witness narrative statement. And I understand. I understand. I'm convinced you're right based upon this case. But then you would distinguish our Johnson case because it was the same situation, but the judge was short-cutting. He said, is there anything else in the statement? And then it takes the word of the prosecutor, which is fine, except Johnson says you can't. You have to look at the statement. And if you were writing the opinion, you would say Johnson doesn't apply in spite of this language because? Because more recent Ninth Circuit case law emphasizes the need for a foundational showing that this information contains Johnson statements, which we don't have from the record here. And because to the extent that there was any error, any error was harmless. There's no indication that anything that might have come of this would have really impacted evidence, the hard evidence of the defendant's guilt on this Target gift card that was taken from the Gwendale letter. Remember, this is the gift card that the defendant's adult daughter is seen on surveillance videotape at Target actually negotiating. I know. And she uses her own credit card as part of that transaction. So it's the evidence is overwhelming. So the question is whether or not we can excuse the conduct based upon harmless error or, as Johnson seems to say, the judge must. And, of course, we can't change Johnson. I mean, you've got to go and bank to do that. So it's a little bit difficult to understand. But I think I have your point. I appreciate your taking time to explain that. All right, counsel. You've well exceeded your time, and we've helped you do that. So we'll hear rebuttal at this point. Thank you. Thank you, Your Honors. Thank you. I just have a couple of points that I'd like to emphasize. Both, I think, the JANGSAC and the Destruction of Evidence Act evidence in this case demonstrate that we're dealing with speculation here. When it comes to the JANGSAC material, the district court never looked at the notes to see what they were. So the government's assertions about the extent of the notes, I think, is not anywhere in the record, and it leaves this Court to speculate, which is why I think in Johnson this Court said it needs to be remanded for the district court to review those records to determine whether there's a problem with what happened. Just not review the records, just review the single statement. The notes themselves. And we don't know how long the notes are, because I don't think the record indicates how long the notes are. What did the agent testify to about the extent of the notes? What did he say? What he testified to was that he interviewed Mr. Gundel and he called him and was discussing the target gift card and going back to the – and I don't remember the details of it, I apologize, but he was discussing the use of the gift card in his conversation with Mr. Gundel, but I don't remember the details of it, I apologize. But what about the notes? What were the details about the contents of the notes? I don't know that there was much of a record made on what the extent of the notes is, Your Honor. There was. There was a discussion between the – it's in the record. A discussion between the judge and the prosecutor. And then it got to a place and the judge asked a question and he relied upon the prosecutor's response. Right. And I understood her question to be what was the testimony as opposed to the conversation between the prosecutor and the judge.  Okay. Did the witness say what was in the notes? I don't think he went into the details of how extensive it was. It was a – I think there was some discussion about him making notes of his contact where he was making arrangements to meet with him to get information about the gift card. But beyond that, I apologize, I don't remember the specifics. On page 900, it says, did you make any notes or anything regarding the June 12 communication? That's what we're talking about, correct? Yes. And he says, no, I don't recall I did. So what is it that you think we should rely upon to say that there was jinks at material? I apologize. I believe that when the defense lawyer got up to cross-examine, and I don't have the record cited in my head. I can provide that to the court afterwards. I believe that there was questioning by the defense lawyer whether the agent made notes that he affirmed that he did. She requested those notes. And then there was a discussion about the notes with the prosecutor. So, again, I apologize. I can provide that to the court afterwards. But I also would just like to note that in this case, the government has the burden to prove beyond a reasonable doubt that the error of the loss of the videotape did not affect the verdict. And that's the standard for harmless error when it's preserved. In this case, the government emphasizes that there were multiple, that two counts were based on mail that was seized from the car that day. But all of the mail seized from the car was admitted against her on all counts as inextricably intertwined 404B evidence. The evidence in this case the government emphasizes is overwhelming. That's certainly not the case. In this circumstance, the, as I noted before, the evidence was not found on her. There was no evidence found on her. And it was only the evidence in the car that was linked directly to her having been found in the car. Finally, I'd just like to note that the government asserts that the video would not have shown the car. I think at ER 161, the witness testified that there would, the video would have shown the car at the time. Unless the Court has additional questions, I will submit. All right. Thank you, counsel. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the Court. And the Court is adjourned.
judges: Wallace, Rawlinson, Watford